LUEDTKE, Respondent, vs. LUEDTKE and wife, Appellants.

*September 20—October 16, 1923.*

*Deeds: Conveyance by aged grantor: Consideration: Degree of proof required: Evidence: Reformation to add omitted provisions.*

1. In an action to set aside certain conveyances of real estate and a transfer of personal property, and to cancel a note and mortgage, the evidence is *held* not to sustain a finding of the trial court that the grantor, the plaintiff, did not have mental capacity to deed away his property except upon full and adequate consideration, or give it away otherwise than by will.

2. A conveyance by an aged and infirm grantor of all his property should ordinarily not be upheld except upon full consideration; but where such disposition was made in accordance with the dictates of natural justice, strong evidence of mental incapacity is required to nullify it.

3. The evidence in this case is *held* not to show that the plaintiff was persuaded by his son and the latter's wife to make a conveyance of his property to him, or that they were the inducing cause of the transfer, and this court is clearly convinced that there was no undue influence used or fraud practiced, and that the plaintiff fully understood all the documents and the disposition of his property made therein.

4. Where plaintiff, a man eighty-six years of age, conveyed his farm to his son (one of the defendants) after previous arrangements with various of his ten children for operating it had always proved unsatisfactory, but his relations with the defendant son appeared to have been harmonious, and such defendant, as part of the consideration, was required to provide plaintiff with a suitable home, proper clothes, nurture, and care, and pay his reasonable funeral expenses, and the value of the property acquired by the defendant is about $6,000, the disposition made by plaintiff of his property cannot be said to be contrary to natural justice.

5. The undisputed evidence disclosing that it was the mutual intention of both parties to a deed that the grantee was to provide the grantor with a proper home and care for the balance of his life and also pay his reasonable funeral expenses, and such provisions were inadvertently omitted in the deed by mutual mistake of the parties, a reformation of the deed will be directed.

6. Where a will, executed contemporaneously with the deed to the farm, disposed of the unpaid consideration to various legatees, to be paid by the defendant son within one year after the plaintiff's death, and this unpaid amount formed part of the consideration for the deed, such amount remained subject to the plaintiff's absolute power of disposition, except as to time of payment; and although a provision for the payment of the legacies was not inserted in the deed, the amount of the legacies constituted an equitable lien upon the property transferred until paid.

7. The direction to pay the legacies, by a·mutual mistake of the parties, having been omitted from the deed, a reformation of the deed will be ordered adding such provision.

APPEAL from a judgment of the circuit court for Green Lake county: CHESTER A. FOWLER, Circuit Judge. *Reversed.*

The appeal is from a judgment in favor of the plaintiff and against the defendants, setting aside two certain conveyances of real estate and a transfer of personal property, and annulling and canceling a note and mortgage.

The plaintiff is the father of the defendant *Fred A. Luedtke,* and the latter's codefendant is his wife. Plaintiff, a man about eighty-six years of age, on or about the 26th day of March, 1921, and for some time prior thereto, was the owner of about 240 acres of land in the town of St. Marie, Green Lake county, Wisconsin, and ten acres in Marquette county, and of a certain interest in personal property. For many years prior to said last named date, by reason of physical infirmities attendant upon old age, plaintiff was unable to personally operate or supervise the operation of his farm, and was thus obliged to enter into an agreement with various of his ten children by leasing such farm to them. It also appears that the arrangements made with his children other than the defendant *Fred* proved rather unsatisfactory, and that two years prior to 1921, at the special solicitation of the plaintiff, *Fred* leased the farm

from the plaintiff and operated the same, and continued so to do until March 26, 1921.

It is undisputed in the evidence that for about a week prior to said last named date the plaintiff discussed the advisability of conveying said farm to his said son *Fred,* and, having arrived at a substantial understanding, at the suggestion of the plaintiff they called upon County Judge Kniskern of Green Lake county to execute the necessary documents in the premises; that said Kniskern, by reason of his official position, refused to draft the necessary papers, but recommended the parties to engage the services of one H. E. Megow, a justice of the peace residing at Princeton. The plaintiff and Megow had been intimately acquainted for a period of upwards of twenty years, and both were able to speak the German language fluently, and had reasonable command, both as to speech and writing, of the English language. Besides being a farmer the plaintiff had also had considerable experience in business and had occupied public positions of trust, such as town assessor and justice of the peace; had been one of the promoters and organizers of a town mutual insurance company; had held the office of president of such company, and at the time of making the transfer herein referred to was its secretary and a director thereof, and also an insurance agent. Pursuant to such advice from said Kniskern the parties then proceeded to the office of said Megow, where the transaction was fully discussed by the latter and the plaintiff at considerable length, both in the German and the English language. At such meeting the plaintiff, among other things, exhibited a memorandum containing notations of various amounts which he desired his son *Fred* to pay to his various children, aggregating in all the sum of $5,100. The total consideration of the transfer was also discussed, and was fixed at the sum of $11,100. Thereupon Megow prepared two warranty deeds, one conveying the real estate in Green Lake

county and the other the ten acres in Marquette county. A promissory note for $6,000 was also executed by the defendants to the plaintiff as follows:

"$6,000.    .    Princeton, Wis., March 26, 1921.

"For value received, we promise to pay to the order of *F. W. Luedtke* on the sum of six thousand dollars ($6,000), the interest thereon at the rate of four per cent. per annum after date, interest payable annually up to and not after the death of *F. W. Luedtke* [the father], and at and after the death of the said *F. W. Luedtke* this note shall cease and be null and void. This note is secured by a mortgage on real estate of even date hereof.    FRED A. LUEDTKE.

"Mrs. FRED LUEDTKE."

To secure said note the defendants executed a mortgage upon said real estate, which mortgage contained the provision that after the death of the plaintiff the same should become null and void and satisfied. A will was also drawn at the same time by which the sum of $5,100 in various amounts was bequeathed to plaintiff's children other than his son *Fred,* and the balance of the estate was devised and bequeathed to the defendant *Fred A. Luedtke.*

The various documents were, prior to their execution, read to the plaintiff by the scrivener, and the plaintiff himself carefully read the same, and in the course of such reading suggested two important corrections. Plaintiff discovered a mistake in the description of one of the forties described in the deed, and also directed that the various legacies provided for in the will should be paid after the expiration of one year subsequent to his death. The deeds and the mortgage were thereupon recorded, and the will, at the suggestion of the plaintiff, was left with Megow for safe keeping.

It further appears that the son *Fred* was indebted to the plaintiff for moneys advanced in the sum of $653, and while the plaintiff testified that he requested this sum to be secured by the mortgage, the evidence is practically undisputed that the payment of this money was privately arranged for and was not to be covered by the mortgage.

Furthermore, the parties agreed that the son *Fred* should furnish the plaintiff during the balance of his life with board and lodging and attend to his personal needs, and that plaintiff would pay therefor at the rate of $150 per year, and that the son *Fred* should, out of the principal amount of $6,000 secured by the note and mortgage, pay the reasonable funeral expenses of the plaintiff.

Upon the execution of the documents before mentioned the parties returned to the farm, and the plaintiff resided with his son *Fred* up to the month of December, 1922, and during all of this time the relations between the parties appeared to be pleasant, the plaintiff being in perfect accord not only with everything that his son *Fred* did, but perfect harmony also existed between the plaintiff and the son's wife and three minor children.

In the month of December, 1922, some of plaintiff's other children procured a copy of the mortgage and learned of the disposition that plaintiff had made of his property. Plaintiff then claimed that the note and mortgage were not in accordance with his real intentions at the time he executed these documents, and that he not only understood, but was made to understand when the documents were executed, that the son *Fred* was to pay the interest upon the note and mortgage during the lifetime of the plaintiff, and that upon his death, after the payment of his funeral expenses, the balance thereof was to be distributed equally among all his children. Specifically stated, his contention was that he did not understand or comprehend the meaning of the word "void" as used in the note and mortgage and also in the will, and that as he understood it this word in its significance was the same as the word "divided." The plaintiff thereupon was advised by his other children to consult an attorney, and as the result thereof the present action was begun.

The complaint in substance charges that the defendants and Megow conspired to induce the plaintiff, while the latter was feeble and infirm by reason of old age and while

in a condition where he could not resist the importunities of the defendants and said Megow, to execute the documents above referred to, and that such documents were so executed as the result of undue influence exercised upon the mind of the plaintiff.

Among other things the court found that:

"The plaintiff was at the time of the execution of said instruments first mentioned so weakened mentally by his age and infirmities that he was easily misled and subject to influence by those about him, and he was not then mentally competent to deed away his property except upon full and adequate consideration or give the same away otherwise than by will, if he was then so competent, as to which I express no opinion. He did not understand the language of said note and mortgage or the effect of said instruments or intend absolutely and irrevocably to release the defendant from payment of said $6,000. The defendant at the time understood that he was released from such payment; and that he would be required to pay only $5,100 for said property, and that only after the death of the plaintiff."

As conclusions of law the court declared the deeds and note and mortgage void, and vacated the same and directed their cancellation of record, and also set aside the transfer of the personal property. Judgment was thereupon entered accordingly, and the defendants prosecuted this appeal.

Further facts will be found in the opinion.

For the appellants there was a brief by *Lehner & Lehner* of Oconto Falls, and oral argument by *Philip Lehner* of Princeton.

For the respondent there was a brief by *Kelley & Ostrander* of Princeton, and oral argument by *J. L. Kelley*.

DOERFLER, J. In order to set aside such findings of the court it must appear that they are contrary to the clear preponderance of the evidence. While plaintiff's deposition was being taken in the hospital in December, 1922, after the commencement of this action, the plaintiff unquestion-

ably was in an enfeebled condition of health, due not only to the infirmities of old age but to illness. We have read this deposition carefully, and we are convinced that it discloses a mental condition on the part of the plaintiff at that time, for a man of his age, which is unusual. In the course of his examination he recalled in detail nearly every transaction which transpired at the time of the execution of the documents on March 26, 1921. He repeated from memory the various amounts bequeathed to each of his children in the will, and also explained the reason why the total amount of the consideration, which was originally fixed at $11,000, exceeded that sum by $100. He remembered distinctly the two corrections which he suggested to Megow before the documents were executed. Every question was answered by him rationally in fairly good English. He bore in mind the exact amount of money which he had loaned to his son *Fred,* namely, $653, and remembered that, while it was his original idea to have the payment of this sum secured by the mortgage, nevertheless he entered into a private agreement independent of the documents by which his son *Fred* agreed shortly to repay this sum to him. In fact, everything connected with the entire transaction, which involved a large number of facts and conditions with respect to the transfers, the note and mortgage, and the will, were clearly in his mind, with the exception only of the disposition that was made with respect to the balance of the $6,000 after the payment of his funeral expenses. This mental condition was made manifest during the course of the taking of the deposition in December, 1922, almost two years after the documents were executed, and produces a decided impression of mental competency. But whatever may have been his mental condition in December, 1922, the real test must refer to his condition on March 26, 1921, and as to the latter date the record is absolutely devoid of any evidence tending to prove mental incompetency.

To further confirm plaintiff's mental competency, atten-

tion is called to the business experience which the plaintiff had for many years during a long and active life, which included the holding of important offices in connection with both public and private corporations.  He had served his town in the capacity of an assessor and as justice of the peace.  He was one of the promoters and a charter member of a town insurance company, and had been connected with that company as an official during the greater portion of the life of such company.  He had served as its president, and at the time of the execution of the documents was one of its directors and its secretary, and was also engaged in acting as an insurance agent for it.  He had a fairly good knowledge of the English language, and it must be presumed that he understood words frequently used in connection with the offices which he held.

But it is contended by plaintiff's counsel, and it was so found by the court, that by reason of his extreme age and the mental infirmities attendant thereon he was a ready prey for those seeking to obtain an undue advantage, and that he possessed no ability to resist persuasions, and that therefore these conveyances should not be upheld unless it should appear that they were executed upon full consideration.

The general doctrine declared by the learned trial judge, that a conveyance by an aged and infirm grantor of all of his property should not ordinarily be upheld excepting upon full consideration, appears to us to be sound and well fortified by the law; but whether or not such a conveyance is subject to successful attack depends upon certain conditions, one of which is that, if the disposition of the property is made in accordance with the dictates of natural justice, strong evidence of mental incapacity is required to nullify the same.  *Gunderson v. Rogers,* 160 Wis. 468, 152 N. W. 157.  In other words, the test is based largely upon the fairness and justice of the disposition.

Was the disposition of plaintiff's property, as evidenced by the documents in question, contrary to the dictates of

natural justice? Plaintiff was the owner of a farm consist-
ing of about 250 acres of land. For many years prior to
1921 he had been unable to operate or supervise the opera-
tion of the same. For many years the farm had been leased
to various of his children other than his son *Fred,* with
unsatisfactory results, causing him much trouble and an-
noyance. He had great confidence and placed considerable
trust and reliance in his son *Fred.* Two years prior to
1921, being greatly discouraged with his experiences, he
implored his son *Fred* to occupy the farm under an agree-
ment which provided for working the farm on shares. There
is nothing in the record to show that the relations of the
plaintiff and his son *Fred* during this two-year period were
anything but harmonious and happy. For about a week
prior to March 26, 1921, the plaintiff and his son *Fred* dis-
cussed the advisability of transferring the farm upon cer-
tain conditions, and it appears beyond contradiction that
when they finally went to the office of Megow all of the
details of the transaction had been agreed upon. There is
no evidence in the record that the defendants either per-
suaded the plaintiff to make the transfer or that they were
the inducing cause of such transfer. Plaintiff realized, as
would be natural for a person of his age, that he would
have comparatively few years to live, and that in order to
enjoy the remainder of his life he should be relieved of all
responsibility in connection with his property; that he should
be provided for in a suitable home, in care of one in whom
he had trust and confidence and who would attend to all of
the necessities and wants of extreme old age. Out of all
his numerous children he selected his son *Fred.* Naturally
he would not consult his other children upon this subject, in
view of the experiences he had with them in connection
with his property. He felt a tender regard not only for *Fred*
but also for his wife and children, and his associations in his
son's home were always happy and pleasant. Under these
circumstances he devised the entire scheme for the dispo-

sition of his property which was subsequently realized by the execution of the documents in question.

While the plaintiff testified that he thought his farm was worth about $15,000 and that he intended his son *Fred* should have the benefit of its value over and above $11,100, his evidence as to value is not very convincing. Disinterested witnesses who were familiar with the land placed its value at $10,000, and from all the evidence in the case we are disposed to hold that such latter value is substantially correct; so that assuming the property transferred to the defendant *Fred* as reasonably worth the sum of $11,100, the amount acquired by *Fred* would be equal to $6,000, less the reasonable funeral expenses of the plaintiff. We cannot say that the disposition made by the plaintiff of his property was contrary to natural justice.

There also devolved upon the defendant *Fred* the duty of providing for the plaintiff a suitable place in the home, proper attention and care in sickness and in health, the washing and mending of his clothing, and other incidentals connected with the obligation assumed. Such obligations are oftentimes extremely trying; so that it is but natural that a special and a larger provision should have been made for *Fred* than was made for the benefit of the other children.

The contention that the plaintiff did not understand the meaning of the word "void" is so contrary to the natural import of the evidence in this case as to require but very little consideration. As a town assessor and a justice of the peace it must be presumed that this term came frequently to his attention. The same may be said of his experience with the fire insurance company, of which he had been both president and secretary. He carefully read and had read to him each of the documents. He discovered inaccuracies and an omission upon examining them. He had a fluent use of the German language, and in the very sentences contained in the note, the mortgage, and the will in which the word "void" was used, another word of like meaning was used,

namely, "null." There is no contention on his part that he did not know the meaning of the word "null;" in fact, this word is also used in the German language and has the identical meaning that it has in English. There is no contention that he did not know the meaning of the word "cease" as it is used in the note in the sentence which reads in part, "this note shall *cease* and be null and void." The note itself does not provide for the payment of the principal of $6,000, but provides solely for the payment of the interest at the rate of four per cent. during his lifetime. The entire documents, while perhaps not clothed in the aptest or most precise language, are clearly intelligible, and the very provisions complained of are expressed in language which plaintiff would be most apt to understand, and which he himself, had he acted as the scrivener, would have been most likely to have used. It appears to us quite conclusively that had it not been for the troublesome intervention of his other children the present litigation would never have been started.

We are therefore clearly convinced (1) that plaintiff had sufficient mental capacity to execute the documents; (2) that no undue influence was used on the part of defendants or Megow to induce such execution; (3) that the defendants and Megow were neither guilty of actual or constructive fraud; (4) that the disposition of plaintiff's property is not contrary to natural justice; (5) that plaintiff fully understood all of the documents and the disposition of his property made therein.

The undisputed evidence in the case discloses that it was the mutual intention of the parties that the defendant *Fred A. Luedtke* was to assume the obligation of providing the plaintiff with a proper home and with proper care and nurture during the balance of his life, for which the son *Fred* was to be in part compensated by the plaintiff by the payment of $150 per year. It was likewise mutually understood that the residue of the $6,000, forming a part of the

consideration, was to go to the defendant *Fred* after the payment of plaintiff's reasonable funeral expenses. The court found, and the evidence shows, that these two provisions were inadvertently omitted by the mutual mistake of the parties, and a reformation of the deeds is therefore directed so that there shall be included therein, immediately · preceding the attestation clause, the following:

"This transfer is made upon condition that the grantee during his lifetime shall during the remainder of the grantor's life provide him with a suitable home, proper clothing, nurture, and care, and that the grantor shall pay in part consideration therefor the sum of $150 per year. And it is further agreed as a part consideration of this transfer that the said grantee, *Fred A. Luedtke,* shall upon the death of the grantor pay his reasonable funeral expenses."

The will contains a provision for the payment of a number of legacies to the children of the plaintiff after the payment of his debts and funeral expenses, and then proceeds as follows:

"All of the above mentioned amount is to be paid over to the (within one year) above named, by my son *Fred A. Luedtke,* out of my said estate which I have deeded over to said *Fred A. Luedtke* this date. . . . "

Plaintiff's counsel argue that the title to the property of record, pursuant to the transfers, is in the defendant *Fred A. Luedtke,* and that inasmuch as there are no provisions in the deeds or in the mortgage indicating the obligation of *Fred* to pay these legacies, the defendants would be in a position to transfer the property and to give good title, subject only to the mortgage, and that therefore the legatees would have no lien or security for their legacies, and would, in case of the insolvency of the defendants after the death of the plaintiff, be absolutely remediless. Such a situation indeed would be most deplorable, as there can be no doubt that the parties fully intended, as is shown by the provisions of the will, that these legacies should be

paid out of the property, or its proceeds, by *Fred.* While contemporaneously with the execution of the deeds, note, and mortgage the plaintiff executed the will in question in and by which he disposed of the sum of $5,100 to various legatees, this amount formed a part of the consideration of the transfer and remained subject to his absolute power of disposition, limited only by the terms of the obligation of the son *Fred* to make payment thereof after the expiration of one year after plaintiff's death; and in the meantime and until the payment of this sum the same constitutes an equitable lien upon the property transferred. *Krahn v. Goodrich,* 164 Wis. 600, 160 N. W. 1072; *Korn v. Friz,* 128 Wis. 428, 107 N. W. 659; *Merton v. O'Brien,* 117 Wis. 437, 94 N. W. 340; *Wier v. Simmons,* 55 Wis. 637, 13 N. W. 873; *Powers v. Powers,* 28 Wis. 659.

It was not contemplated by either of the parties that a transfer of the property could be made by the defendants so as to defeat this equitable lien. In other words, the minds of the parties met not only as to the power of disposition reserved by the plaintiff but also with respect to the creation of the lien and its continuance in force until full payment had been effected in accordance with the agreement. This failure to incorporate a provision, therefore, fully protecting the beneficiaries under plaintiff's power of disposition, was omitted from the deeds by the mutual mistake of the parties and of the scrivener, and equity will treat that as done which under the circumstances the parties had in mind and which in good conscience ought to have been done. It is therefore directed that the deeds shall be further reformed by adding the following additional provision, to wit:

"This conveyance having been made partly in consideration of the grantee, *Fred A. Luedtke,* making payment of the sum of $5,100 after the expiration of one year after the grantor's death, to such person or persons as said grantor may designate by will or otherwise, such sum shall

constitute a lien upon the property transferred and shall continue until its payment."

*By the Court.*—Judgment of the lower court is reversed, with directions to enter judgment in accordance with this opinion.